IN THE UNITED STATE DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

KIMBERLY SMITH and            )
RANDY CARTER,
                              )   CIVIL ACTION NO.
        Plaintiffs,
                              )    04-00730-CB-M
v.
                              )
BRUNO'S SUPERMARKETS, INC.,
                              )
        Defendant.

**ORDER**

    This matter comes before the Court on the motion for summary judgment filed by

defendant Bruno's Supermarkets, Inc. (Bruno's) seeking summary judgment as to the claims of

both plaintiffs.   This order addresses the motion as it relates to plaintiff Randy Carter.[1]   In its

motion for summary judgment, defendant asserts, *inter alia*, that plaintiff Carter's employment

discrimination claim, which is asserted under the Americans with Disabilities Act, 42 U.S.C. §§

12101-12213 (ADA), is time-barred.  After considering on the briefs and evidentiary materials

submitted by the parties,[2]  the Court agrees that summary judgment is due to be granted because

the claim is untimely.

**Facts[3]**

---

[1]The summary judgment motion with respect to the claims of plaintiff Kimberly Smith are addressed by separate order.

[2]Defendant has filed a motions to strike certain declarations and affidavits submitted by plaintiff in opposition to summary judgment.  (Doc. 63 & 64.)   In ruling on summary judgment, the Court has not considered the exhibits to which objection is made.  Therefore, the motion to strike is **MOOT**.

[3]The facts related to the limitations issue are not disputed.  Because the Court finds the limitations issue to be dispositive, only the facts relevant to that issue are set out.

In December 2000, plaintiff Randy Carter ("Carter") worked for Bruno's as the produce manager at its Fairhope, Alabama store. His duties included unloading trucks, stacking products and moving boxes of produce. The produce truck deliveries occurred three times weekly and unloading them took one hour; moving the produce out to the store could take two days. Approximately seventy percent of the boxes of produce required to be unloaded and moved by Carter weighed over 20 pounds, with some ranging to 38 and 50 pounds in weight. Sixty to seventy percent of a produce manager's time is spent restocking, and at least 50 percent of that time is spent lifting items over 25 pounds.[4] Conducting inventory, which had to be done three times a week, also required heavy lifting.

On December 29, 2000, Carter was diagnosed with carcinoma of the rectum. In January 2001, he submitted to Bruno's a Medical Leave of Absence Form, which stated that he would need to be off work from January 12 to April 5, 2001. Bruno's approved this leave request. On January 12, 2001, Carter had surgery to remove the cancer. As a result, Carter had to have a colostomy bag for the elimination of digested food. Carter has a permanent colostomy and has no pain or discomfort as a result of having it, and he is currently cancer free. On March 9, 2001, Bruno's granted Carter's request to extend his leave until April 26, 2001.

On April 24, 2001, Carter's doctor issued restrictions that specified he could not lift over 20 pounds, and recommended that Carter work in a position where no heavy lifting was required. Bruno's received these restrictions, which were the first work-related restrictions Carter had ever had. Carter was released to return to work starting on May 14, 2001. After being so notified,

---

[4]Restocking is when product is stacked in the cooler and must be brought out to the store some time after it is originally received.

2

Alice Keel, district manager, went to the store and spoke with Carter in the produce department. Together, they discussed his restrictions and the role and duties of the produce manager position. Carter told her that he could not perform duties that required heavy lifting, such as culling racks, unloading trucks, stacking produce in the cooler, and stacking supplies.  On May 11, 2001 Charlie Seagle, risk management director, sent Carter a letter which acknowledged his release to return to work, and restrictions from Dr. Hollensworth, and that also notified Carter that Bruno's needed clarification regarding whether his stated restrictions were temporary or permanent. After receiving Seagle's May 11, 2001, letter on May 15, 2001, Carter remained on leave for the rest of that week.

Based upon an initial determination that Carter's restrictions were temporary, Bruno's returned him to work in a light duty capacity under its alternative work program on May 21, 2001.  Bruno's light duty program is designed so that if someone cannot perform their normal job functions, it will allow them to work in a temporary capacity doing different things throughout the store until they are able to resume their full duties or previous position.  Bruno's returned Carter to work under the alternate duty program as a clerk where he did scanning, light stocking, moving out-dated merchandise, and pricing; none of which required him to lift over 20 pounds.

On May 29, 2001, Dr. Hollensworth drafted another letter regarding Carter, which explained that at the time he released Carter to perform light duty, he did not understand the extent of heavy lifting that was required in his position at Bruno's.  He clarified that Carter's functional limitation of not lifting more than 20 pounds was a permanent limitation.  Dr. Hollensworth then stated that he did not think that Carter could continue to work in his produce

3

manager job due to the amount of heavy lifting involved and recommended that he be put in a position involving no heavy lifting.   On May 31, 2001, Carter presented this letter to his store manager Jim Rossetti, who, in turn, faxed it to Seagle.  Later that day, Rossetti notified Carter that he could no longer work under the temporary light duty program, because it was not designed for permanent restrictions.  He also told Carter that Seagle would be sending him a letter.  May 31, 2001, was Carter's last day at Bruno's.

On June 6, 2001, Carter received Seagle's June 4, 2001, letter, which explained that: "the permanent restrictions assigned by your physician, specifically: no lifting over twenty pounds would prevent you from performing the essential functions of your job as a produce manager and cannot be accommodated.  The amount of lifting required in this position, as well as any other position in the store would require that you be able to safely lift merchandise as needed in order for us to run our business.  I have discussed your return to work restrictions with your Human Resources Director Dan Burchfield and District Manager Alice Keel.  Please understand we have carefully evaluated your return to work situation with respect for accommodation in a [manner] that is consistent with other similarly situated employees in our company."  The letter also advised that, "As your condition moderates, please make the Human Resources/Risk Management department aware of any changes in your restrictions as soon as possible, and we will be happy to reevaluate any possible reasonable accommodation."  Carter did not respond to this letter, nor did he discuss it with anyone at Bruno's.  Carter did not believe that his permanent restrictions would ever improve, and viewed this letter as his "walking papers," from

4

Bruno's, i.e., his termination letter.[5]  Bruno's then placed Carter back on medical leave.  During

the first or second week of June 2001, Carter began a new job as a desk clerk at Shoney's Hotel.

Carter also applied for and was granted a retirement disability pension.  Following the grant of

this pension, Bruno's formally terminated Carter's employment on July 30, 2001.

On December 17, 2001, Carter hand delivered a letter addressed to Seagle and Rozetti

requesting reconsideration of his employment status and accommodations in the workplace that

would enable him to work for Bruno's.  Carter received no response to his request for

reinstatement.  Thereafter, Carter submitted a charge of discrimination which was received by

the EEOC on January 28, 2002.[6]

**Issues Raised**

Defendant has raised several issues on summary judgment.  Among those is the

timeliness of plaintiff's claim.  Because it is clear that the charge of discrimination was not

timely filed--and therefore is the claim is due to be dismissed--the Court does not reach

defendant's challenge to the merits of plaintiff's ADA claim.

**Legal Analysis**[7]

---

[5]There is a dispute of fact as to whether plaintiff refused a proposal by Bruno's to transfer
him to a lower-paying position that would accommodate his lifting restriction.

[6]Carter claims that he originally sent the EEOC a copy of his charge on December 17,
2001, but the EEOC never received that mailing.

[7]The Court's legal analysis is guided by the familiar summary judgment framework.
Summary judgment should be granted only if "there is no issue as to any material fact and the
moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party
seeking summary judgment bears "the initial burden to show the district court, by reference to
materials on file, that there are no genuine issues of material fact that should be decided at trial."
*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has
satisfied his responsibility, the burden shifts to the nonmoving party to show the existence of a
genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on

"It is settled law that in order to obtain judicial consideration of a[n] [employment discrimination] claim, a plaintiff must first file an administrative charge with the EEOC within 180 days after the alleged unlawful employment practice occurred." *Pijnenburg v. West Georgia Health Sys., Inc.* 255 F.3d 1304, 1305 (11th Cir. 2001); 42 U.S.C. § 2000e-5(e)(1). This requirement applies to causes of action under the ADA, as well as claims filed under Title VII. 42 U.S.C. §12117(a); 42 U.S.C. § 2000e-5(e)(1). An unlawful employment practice occurs, and thus the date the limitations period for filing an EEOC charge begins to run, on the date the employee becomes aware of the adverse employment action, not the date the adverse action becomes effective. *Delaware State College v. Ricks*, 449 U.S. 250 (1980) (limitations period began to run on date tenure decision was made and communicated).

Defendant points to evidence that Carter learned he was being dismissed on June 6, 2001 when he received a letter from Seagle (dated June 4, 2001) explaining that Bruno's could not accommodate his medical restrictions. Since these restrictions were permanent, Carter considered this letter as notification of his termination. If the limitations period began to run on June 6, 2001, then the EEOC charge filed January 28, 2002 is untimely.

The Eleventh Circuit addressed the date of accrual issue in *Calhoun v. Federal Nat'l Mortg. Ass'n*, 823 F.2d 451 (11th Cir. 1987). In that case plaintiff Kasper, an employee of the Federal National Mortgage Association (FNMA), was notified of his termination on July 22, 1982. He cleared out his desk and was gone the following day. Thereafter, he negotiated

---

an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)) (footnote omitted).

severance agreement that allowed him to remain on the payroll for an additional year and then

retire under the Civil Service Retirement System.  However, Kasper never returned to work in

any capacity for the FNMA.  The effective date of his retirement was memorialized in a letter

dated August 4, 1982.  Kasper's termination and retirement became effective on August 5, 1983.

Kasper argued that his EEOC charge filed August 24, 1983 was timely based on the effective

date of his termination.  The district court rejected this argument, and the appeals court affirmed,

stating:

> From August 1982 forward, FNMA did not deviate from its expressed intention to
> terminate Kasper as of August 5, 1983.  The proper focus for purposes of
> establishing the time at which the limitations period begins to run "is on the time
> of the *discriminatory act,* not the point at which the *consequences* of the act
> become painful.. . .   The fact of termination is not itself an illegal act." The
> alleged illegal acts here were the decision to terminate and the notice of that
> decision to Kasper. It is clear from the record that Kasper received unequivocal
> notice on July 22 and August 4, 1982 of FNMA's intention to remove him as
> Regional Counsel and to terminate his employment on August 5, 1983. FNMA
> never waivered [sic] from this position.

*Id.* at 455-56 (quoting *Chardon v. Fernandez,* 454 U.S. 6, 8, (1981) (emphasis in original)).

The facts of this case are not materially distinguishable.  On June 6, 2001, plaintiff Carter

received unequivocal notice that his disability would not be accommodated.  Plaintiff viewed the

notice as termination and began a new job the following week.  It is undisputed that the EEOC

charge was filed on January 28, 2001, more than 180 days after the claim accrued.  Therefore, the

charge was untimely, and plaintiff has failed to satisfy one of the prerequisites for suit under the

ADA.

Plaintiff's response to defendant's limitation argument is to ignore the June 6th notice

altogether, and to proceed on the apparent assumption that the limitations period began to run

7

sometime after December 17, 2001, the date plaintiff delivered a letter to Bruno's requesting reinstatement.[8] But plaintiff fails to address, or even acknowledge, clearly established law that a request for reinstatement or reemployment does not begin the limitations period anew. *Hargett v. Valley Fed. Sav. Bank*, 60 F.3d 754 (11th Cir 1995); *Burnam v. Amoco Container Co*, 755 F.2d 893 (11th Cir. 1985) (per curiam). A claim for failure to rehire must be based on a new discrete act of discrimination, *id.*, and no such assertion is made here. Plaintiff's request for reinstatement does not save his untimely EEOC charge.

**Conclusion**

For the reasons set forth above, the Court finds that plaintiff Randy Carter's ADA claim against defendant Bruno's is time-barred. Accordingly, the defendant's motion for summary judgment is hereby **GRANTED**.

**DONE** and **ORDERED** this the 22nd day of August, 2006.

_s/Charles R. Butler, Jr._____
**Senior United States District Judge**

---

[8]Plaintiff's brief in opposition to summary judgment devotes several pages to a limitation argument that is completely inapposite to the issue raised by the defendant. Plaintiff argues that a second EEOC filing on May 6, 2002, relates back to the date his EEOC charge was originally filed--January 28, 2002. Defendant has not asserted otherwise and operates under the assumption that the charge was filed with the EEOC on January 28, 2002. As discussed above, defendant contends that the January 28th filing was untimely. Plaintiff simply does not respond at all to that argument.

8